UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

GARY E. BISZANTZ, d/b/a GARY E.       )
BISZANTZ RACING,                      )
                                      )        No. 5:13-CV-348-REW
    Plaintiff,                        )
                                      )
v.                                    )     MEMORANDUM OPINION AND
                                      )            ORDER
STEPHENS THOROUGHBREDS, LLC,          )
                                      )
    Defendant.                        )

*** *** *** ***

Defendant, Stephens Thoroughbreds, LLC ("Stephens"), moved for summary judgment on all claims made by Plaintiff, Gary E. Biszantz d/b/a Gary E. Biszantz Racing ("Biszantz"). DE #21. Plaintiff responded, DE #38, and Defendant replied, DE #39. The motion is ripe for consideration. For the following reasons, the Court **GRANTS** Defendant's motion for summary judgment (DE #21). The case presents no genuine dispute of any material fact, and each of Plaintiff's claims fails as a matter of law. Mr. Biszantz, an experienced horseman who voluntarily entered an arms' length transaction governed by the highly predictable and demanding Keeneland Conditions of Sale, seeks to evade the effect of those conditions over dissatisfaction with the results of the bargain; this he cannot do, on this record, under Kentucky contract (or tort) principles.

I.      BACKGROUND

Stephens purchased a yearling filly, later to be named SALINA, on September 12, 2012. *See* DE #36-6 (Notice of Sale). Prior to this transaction, Stephens employed Dr. Greg BonenClark, an owner of Florida Equine Veterinary Associates ("FEVA"), to

1

review the filly's records and radiographs in the Keeneland Repository. DE #36-3 (BonenClark Depo.), at 1, 3 (Depo. pp. 3, 10, 12). He performed this inspection on September 11, 2012. *Id.* at 3 (Depo. pp. 10, 12). Also prior to Stephens's purchase, Dr. Robert J. Hunt wrote a letter regarding SALINA dated August 22, 2012, that states, in its entirety, "On April 3, 2012, I performed arthroscopic surgery on the right hind fetlock." DE #36-12 (Hunt Letter). This letter was in the Repository, but John Stephens ("Mr. Stephens," to differentiate him from Defendant) claims he did not learn of it until this litigation. DE #36-5 (Stephens Depo.), at 8 (Depo. p. 30). Dr. BonenClark saw the letter in the Repository, DE #36-3, at 4 (Depo. p. 15), and gave principal Mr. Stephens a general verbal summary of his report from the Repository review, *id.* (Depo. p. 16); *see also* DE ##36-5, at 9 (Depo. pp. 34-35); 36-3, at 4 (Depo. p. 16) ("I would have told him about it.").

After Stephens's purchase, Dr. BonenClark engaged in a series of direct examinations of the filly and monitored her condition over several months. He examined SALINA on September 21, 2012, concerning an abnormality with her left hind fetlock. *Id.* at 4 (Depo. pp. 13-14). In his patient history report of that day, Dr. BonenClark noted a "LEFT HIND MED SUSP[ENSORY] BRANCH GRAD[E] 2 LESION AT ATTACHMENT." *Id.* at 5 (Depo. pp. 17-18); DE #21-10, at 3.[1] On December 8, 2012, Dr. BonenClark observed "sesamoiditis of the medial left hind medial sesamoid," and he reported the sesamoiditis to either Mr. Stephens or Emily Dawson ("Dawson"). DE #36-

---

[1] Dr. BonenClark noted that, in general, 80-90% of thoroughbreds with grade 2 lesions would heal. DE #36-3, at 7 (Depo. pp. 25-26). He predicted SALINA would have "a good chance, a reasonable chance to recover[,]" meaning over 75%. *Id.* (Depo. pp. 26-27).

3, at 8 (Depo. pp. 29-30).[2] Dr. BonenClark took another ultrasound on December 12, 2012, and again noted "LEFT HIND SUSP BRANCH". DE #21-10, at 2. The size of the branch had decreased since September 21, an improvement. DE #36-3, at 8 (Depo. pp. 31-32). Dr. BonenClark again scanned the horse on January 28, 2013. *Id.* at 9 (Depo. p. 35). While the branch appeared marginally bigger on the ultrasound of that date, Dr. BonenClark advised that the "angle of the way you hold the probe can change the size you measured" and that the size thus can be variable. *Id.* at 10 (Depo. pp. 38-39); *see also* DE #36-15 (Bramlage Depo.), at 11 (Depo. p. 43) (agreeing). The treatment record indicates "NO CHANGE" on January 28. DE #21-10, at 2. While Dr. BonenClark had continued concern about the January 28 ultrasound, he only stressed patience—"take your time"—to Mr. Stephens and Dawson. DE #36-3, at 12 (Depo. p. 47). The patient history was never provided to Defendant, and the evidence is that Dr. BonenClark never told Mr. Stephens or Dawson of the "lesion," at least as to that term.[3] *Id.* at 12-13 (Depo. pp. 48-49).

Dawson is Mr. Stephens's assistant trainer. She was with Dr. BonenClark when he performed SALINA's September 2012 ultrasound. DE #36-8, at 8 (Depo pp. 30-31). Dr. BonenClark told her "the [suspensory] branch was enlarged[,]" but he did not tell her

---

[2] This diagnosis (as well as the lesion) "certainly" does not concern the same procedure as Dr. Hunt's arthroscopic surgery; the sesamoiditis was on the *left* hind sesamoid, while the surgery was on the *right* hind fetlock. DE #36-3, at 13 (Depo. pp. 51-52). Additionally, Mr. Stephens testified that Dr. BonenClark did not explain his September 21 observations to him. DE #36-5, at 12 (Depo. p. 46-47). Mr. Stephens also did not recall Dr. BonenClark giving him a report on the information in the Repository, except for saying SALINA had sesamoiditis. *Id.* at 9 (Depo. p. 35). Mr. Stephens generally described the degree of deference he gave Dr. BonenClark, or his veterinarian at the time, to only bring issues to his attention when needed. He would trust the veterinarian to properly perform his or her work. *Id.* at 10 (Depo. p. 37).
[3] Although he "probably would have said this horse has a diffused hypoechoic area at the attachment." DE #36-3, at 20 (Depo. p. 78).

there was a lesion.[4] *Id.* at 8-9 (Depo. pp. 31-33). He also told her that SALINA had sesamoiditis, but not that the enlarged suspensory branch was at the point of attachment to the bone. DE #36-22 (Dawson Re-Depo.), at 4 (Depo. p. 16). Between the September 21 and December 8 ultrasounds, SALINA was in a paddock and was on some type of conservative exercise program, probably including being under saddle and jogging on the track. DE #36-8, at 10 (Depo. p. 38). Like all horses, SALINA underwent a customized training regimen. *See* DE #36-5, at 3 (Depo. p. 9) (indicating training is determined for each horse individually; "There is no set program.").[5] BonenClark told Dawson the December 8 ultrasound showed improvement and that the "branch was smaller in size." DE #36-8, at 10 (Depo. p. 39). He still did not mention a lesion. *Id.* Prior to January 28, 2013, Dawson did not remember having any issues with SALINA; "she was easy to take care of and easy to train." *Id.* (Depo. p. 42). Dawson remembered the January 28 scan to be the same as the previous scan. *Id.* (Depo. p. 43). SALINA "was a very sound, athletic, really very nice filly." *Id.* at 12 (Depo. p. 48).[6]

The January 28 review communicated to Stephens that SALINA was status quo from early December, not better and not worse. Stephens then had the horse in continuous training leading up to the Keeneland sale in April 2013. Dr. BonenClark did not see the filly again in advance of that sale.

---

[4] However, in a post-suit review of the record, Dr. Michael A. Spirito averred that "SALINA arrived at Stephens Farm in September 2012 with a Grade 2 lesion[.]" DE #36-20 (Spirito Affidavit), at ¶ 5(a). He opined that this caused a delay in training and disparate treatment of the filly. *Id.* at ¶ 5. This largely, though not precisely, corroborates Dr. BonenClark's handling of the filly.

[5] SALINA's training records reflect this reality, as well as Stephens's efforts to respond to her known conditions. DE #36-19. Per the vet's advice, Stephens moved cautiously with SALINA in the fall of 2012.

[6] Further, Mr. Stephens testified that there were no health issues with SALINA between January 28, 2013, and the time she was transported to Keeneland for sale; she "never missed a day of training, never sick, nothing. She was wonderful." *Id.* at 14 (Depo. p. 55).

4

Biszantz bought SALINA from Stephens on April 9, 2013, at the annual Keeneland Two-Year-Olds In Training Sale, pursuant to a written agreement. DE #21-2 (Notice of Sale, Purchase and Security Agreement, and Conditions of Sale). SALINA did not originally sell when she went through the auction ring because she was RNA. DE #36-5 (Stephens Depo.), at 6 (Depo. pp. 21-22). After the auction, Mr. Stephens, on behalf of Defendant, contacted Steve Young ("Young"), Biszantz's agent, by phone to offer to sell SALINA. *Id.* at 20 (Depo. pp. 77-79). Young had observed SALINA in person, and Mr. Stephens allegedly had told Young, prior to the April sales, that he "liked her a lot." DE #36-13 (Young Depo.), at 3 (Depo. pp. 10-11).[7] After consulting with Biszantz, Young made a $175,000 offer; Mr. Stephens accepted. *See* DE #21-2. In the contract, the parties agreed to be bound by Keeneland's Conditions of Sale ("COS"), to say the least a comprehensive document. *Id.* at 1 ("Both Consignor and Purchaser agree and acknowledge that this sale shall be subject to and governed by the Conditions of Sale and they agree to be bound thereby[.]"). Both sides concede COS application. DE ##1-1 (Complaint), at 3 ("[t]he applicable Conditions of Sale"), 3 (Answer), at 1, 3.

Prior to the sale, on April 4, 2013, Stephens hired Michael J. Chovanes, D.V.M., to take radiographs[8] of SALINA at the Keeneland sales grounds to place in the Repository. DE #36-9 (Chovanes Depo.), at 2 (Depo. p. 7). Dr. Chovanes described "a moderate sesamoiditis in a left hind ankle" and "may have told" Mr. Stephens that "one to two out of five veterinarians would be a little bit worried about th[e left] hind ankle."

---

[7] This timing observation rests on Young's view of the remark. This meant, to Young, "that [Mr. Stephens] thought she was going to bring quite a bit of money." DE #36-13, at 3 (Depo. p. 11). Young had watched SALINA multiple times, *id.* at 3 (Depo. pp. 10-11), and the remark plainly was a sale prediction to Young.

[8] A radiograph is used to image bone; an ultrasound is used to image soft tissue. DE #36-9, at 10 (Depo. p. 38).

*Id.* at 4 (Depo. p. 14).[9] Dr. Chovanes said he did not tell Mr. Stephens the possibilities and risks of training, nor he did discuss with Mr. Stephens the option of doing an ultrasound to gain further information. *Id.* at 5 (Depo. p. 17).[10] He testified that which procedures and investigation to undertake are strictly up to the owner or client because each entails a cost. *Id.* at 16 (Depo. p. 61); *see also* DE #36-15 (Bramlage Depo.), at 4 (Depo. p. 14) (acknowledging that whether to take additional ultrasounds, due to the costs involved, "depends on the client"). Dr. Chovanes acknowledged many things can affect the physical condition of a horse in a material way, including training, putting it under tack, galloping, shipping, and simply passage of time. *Id.* (Depo. pp. 61-63); *see also* DE #36-11 (Hay Depo.), at 9 (Depo. pp. 33-34) (same).

On April 7, 2013, Biszantz retained Scott Hay, D.V.M., an equine veterinarian, to examine SALINA's radiographs in the Keeneland Repository. DE #36-11, at 2 (Depo. p. 7).[11] Dr. Hay "didn't have any significant concerns about the horse's radiographs." *Id.* (Depo. p. 8). He did not see sesamoiditis. *Id.* at 3 (Depo. p. 10). He did not request to see Dr. Chovanes's radiological report, contained in the Repository (and he normally would

---

[9] Looking at the radiographs, Dr. Chovanes said, "[T]he irregularity that I see way up at the top of the sesamoid is within normal limits on that sesamoid." DE #36-9, at 7 (Depo. p. 27). He identified no abnormality on the right hind fetlock. *Id.* at 8 (Depo. p. 29).

[10] Regarding Dr. Hunt's statement about the arthroscopic surgery, *see* DE #36-12 (Hunt Letter), Chovanes said, "That's about as broad as you could get." DE #36-9, at 12 (Depo. pp. 45-46). Even if he had seen Hunt's letter, he would not have recommended a buyer contact Hunt about the surgery; he simply would have read the radiographs. *Id.* (Depo. p. 48). He acknowledged, though, that "[a]rthroscopic surgery is usually invasive joint surgery. . . . [Y]ou are invading the joint[,]" but "it is strictly a cosmetic procedure." *Id.* at 14-15 (Depo. pp. 56-57).

[11] The testimony is clear and uncontradicted that the Repository radiographs were, in fact, of SALINA. *See, e.g.*, DE ##36-3, at 13 (Depo. p. 52); 36-5, at 18-19 (Depo. pp. 72-73); 36-9, at 2 (Depo. p. 7).

not do so). *Id.* at 4 (Depo. p. 13-14).[12] Dr. Hay expressly confirmed that he could have requested and viewed the Chovanes report. *Id.* at 10 (Depo. p. 37).

Biszantz did not hire a veterinarian to radiograph SALINA before she left Keeneland (nor did he have an ultrasound done before buying her or before she left Keeneland), but Young believed that if Biszantz had, the radiographs would have been the same as Chovanes's. DE #36-13, at 5 (Depo. pp. 18-20). Young advised that no one disclosed, prior to the purchase, SALINA's prior surgery or Dr. BonenClark's report of a lesion. *Id.* at 4 (Depo. p. 15).

After purchasing SALINA, Biszantz shipped her to Stonestreet in Ocala, Florida, to train. DE #36-3, at 15 (Depo. p. 60). Ian Brennan was her trainer. *Id.* Brennan advised Dr. BonenClark that "she was doing fine" in late May or early June 2013. *Id.* SALINA "had no problems the entire time she was at Stonestreet." *Id.* at 16 (Depo. p. 62). After approximately three months, Biszantz sent her to Todd Pletcher in New York for further training, where she manifested pain to the extent she was unable to enter a full training regimen. *See* DE #36-13, at 6 (Depo. pp. 22-23). Biszantz then sent SALINA to Rood & Riddle in Lexington, where she was treated by Lawrence Bramlage, D.V.M., who concluded (in August 2013) that her left hind medial suspensory branch had a major injury that appeared to start at the sesamoid bone. *See* DE #36-15 (Bramlage Depo.), at 9 (Depo. pp. 33-35). Dr. Bramlage opined that the Repository radiographs displayed no

---

[12] Additionally, however, if Dr. Hay had known of Dr. BonenClark's history, he would have recommended that Young do a new ultrasound on the left hind fetlock before purchasing. DE #36-11, at 10 (Depo. p. 37). Dr. BonenClark's conclusions might indicate possible future effect on the filly's racing career. *Id.* at 5 (Depo. p. 17). Dr. Hay also would have liked to have known about Dr. Hunt's surgery because "there was definitely an invasive joint surgery." *Id.* at 6 (Depo. p. 21); *see also* DE #36-15 (Bramlage Depo.), at 7 (Depo. pp. 26-27) (stating flatly that Hunt's surgery, by definition, is invasive joint surgery); *but see* DE #36-5 (Stephens Depo.), at 8 (Depo. p. 32) (indicating Hunt's surgery is not necessarily invasive joint surgery).

sign of injury,[13] but he took his own radiographs and ultrasounds on August 27, 2013, on which he observed a left hind ligament injury, and advised that the injury was old, perhaps from 2012. *Id.* at 8 (Depo. p. 31). He noticed avulsion fractures, which were not present in the radiographs at the time of sale. *Id.* at 10-11 (Depo. pp. 40-41). There was no indication from the April radiographs that SALINA "was a likely candidate to have a re-occurrence problem." *Id.* at 12 (Depo. p. 45).

Around August 15, 2013, Biszantz received a billing statement from FEVA that showed a previous balance due for December 2012 – January 2013 tendon work on SALINA. This tipped Biszantz off to possible pre-sale health problems and was the catalyst for the current suit. DE #36-18, at ¶ 11. Plaintiff filed a Complaint in Fayette Circuit Court, making fraud and breach of contract/warranty claims. DE #1-1 (Complaint). Defendant removed the case to this Court. DE #1 (Notice of Removal). Plaintiff generally alleged that (1) Defendant concealed a preexisting, known injury to SALINA's left hind suspensory ligament; (2) the Repository radiographs gave a false or misleading impression of SALINA's condition; and (3) Defendant administered undisclosed medications to the filly. DE #1-1, at 6-8. Plaintiff alleged essentially the same conduct as establishing violations of the COS, identifying four specific provisions allegedly breached, while also challenging the enforceability of the COS's time and remedial limits. *Id.* at 8-9. Plaintiff finally alleged Defendant's creation and breach of a warranty by placing radiographs in the Repository. *Id.* Defendant rejected each argument and asserted a variety of affirmative defenses. DE #3 (Answer).

---

[13] He reviewed the Repository radiographs and wrote, "They look fine to me as they did to Dr. Hay." DE #36-16, at 2.

On the parties' request, Judge Hood ordered a period of limited discovery, *see* DE #6 (Order), and later stayed commencement of full discovery, *see* DE #10 (Order). The parties then consented to the jurisdiction of a Magistrate Judge. DE #12. A period of limited discovery followed, and Defendant moved for summary judgment. *See* DE #21. The parties have fully briefed the issues raised. *See* DE ##21-1, 38, 39.

## II.      STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at

9

2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

### III.   ANALYSIS

First, the Court must make a choice of law determination. The Court, in this diversity case, applies Kentucky's substantive law. *See Erie R.R. Co. v. Tompkins*, 58 S. Ct. 817, 822 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."); *see also Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002) ("In federal diversity actions, state law governs substantive issues[.]"). Likewise, the COS and PSA contain choice-of-law provisions directing application of Kentucky law, *see* DE #21-2, at 3, 29-30, and the parties do not dispute that Kentucky law applies (and indeed they rely on it).

#### A.   *Breach of Contract / Warranty*

##### 1.   The Parties' Agreement

Plaintiff asserts Defendant breached several provisions of the COS. DE #1-1, at 8. Defendant responds by generally asserting Plaintiff fatally failed to comply with the COS's notice, timing, and dispute resolution requirements.[14] DE ##3; 21-1, at 8. The parties' 3-part agreement is filled with warranty disclaimer language and precise provisions governing disputes (including time restrictions), often in pronounced, bolded, capitalized lettering.[15] Both sides unequivocally agreed "to be bound" by all COS terms.

---

[14] Biszantz argues that Stephens cannot defend based on the text of the agreement because the COS does not "condone or facilitate fraud." DE #38, at 23. The Court will consider Biszantz's fraud arguments below.

[15] For example, the PSA, on its front page, states, "**OTHER THAN LIMITED WARRANTIES EXPRESSLY STATED AND LIMITED BY NOTIFICATION AND TIMING REQUIREMENTS AS FURTHER STATED IN THE CONDITIONS OF SALE, THERE ARE NO WARRANTIES, EXPRESS OR IMPLIED, BY KEENELAND OR ANY SELLER, CONSIGNOR OR AGENT AT ANY KEENELAND SALE AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY ANIMAL SOLD AND THE HORSE AND ANY INTEREST THEREIN IS SOLD 'AS IS.'**" DE #21-2, at 2 (emphasis in original). These warnings are in the parties' agreement *from the first page*, indicating the

DE #21-2, at 1. Application of the agreement, by its clear terms, plainly resolves Plaintiff's breach of contract claims in favor of Defendant.

### a.    Terms of the Agreement

The COS—the "**LEGALLY BINDING RULES**" of the sale, *id.* at 5 (emphasis in original)—begins, "All prospective Purchasers . . . are accepting any horse purchased with all faults, including all conditions and defects except for applicable limited warranties set out in Conditions NINTH through FOURTEENTH." *Id.* (Condition FIRST).[16]

In turn, condition NINTH provides, in relevant part, "The following conditions of a horse must be **must be so disclosed by placing a veterinary certificate in the**

---

parties' knowledge of and desire for them. Both sides agree that all participants in this transaction were sophisticated parties with long histories in the horse industry, indicating both were fully aware of and bargained for (or at least had full and free awareness and assent to) the terms of their agreement.

[16] The COS is clear: "<u>**WARRANTY DISCLAIMER: OTHER THAN THOSE LIMITED WARRANTIES EXPRESSLY STATED IN THESE CONDITIONS OF SALE (in Conditions NINTH through FOURTEENTH)**</u> . . . **THERE IS NO WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, BY KEENELAND, SELLER, AND/OR OR** [sic] **CONSIGNOR AS TO THE SOUNDNESS, CONDITION, WIND OR OTHER QUALITY OF ANY HORSE SOLD IN THIS SALE. THERE IS NO WARRANTY, EXPRESS OR IMPLIED, BY KEENELAND, SELLER AND/OR CONSIGNOR, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, AS TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY HORSE OFFERED IN THIS SALE. SUBJECT TO THE LIMITED WARRANTIES STATED HEREIN, ALL SALES ARE MADE ON AN 'AS IS' BASIS, WITH ALL FAULTS AND DEFECTS. <u>OTHER THAN FAILURE TO SATISFY THE EXPRESSLY LIMITED WARRANTED CONDITIONS LISTED BELOW, NO OTHER DEFECTS SHALL CONSTITUTE A NONCONFORMITY, SUBSTANTIAL OR OTHERWISE, WITH THE TERMS OF THE CONDITIONS OF SALE/CONTRACT.</u>**" DE #21-2, at 10 (Condition EIGHTH) (emphases in original).

**Repository** . . .: all horses that . . . are two years of age or less and have undergone (a) invasive joint surgery[.]" *Id.* at 11 (emphasis in original).[17]

Condition THIRTEENTH provides, "Any [two-year-old in training] which has an injury to or disease of the bone structure which, in the opinion of a veterinarian, would more likely than not materially and adversely affect its suitability for training and racing, must be so announced at the time of sale OR in lieu of announcement at the time of sale, must be so disclosed by placing radiographs and/or a veterinary certificate in the Repository . . . reasonably disclosing that one or more of the conditions are applicable." *Id.* at 15. It also provides a specific notice procedure before the Purchaser may elect Rejection. *Id.* Condition TWELFTH, as incorporated in Condition THIRTEENTH, provides for a particular 3-veterinarian dispute resolution procedure for alleged violations. *Id.* at 14-16.

Condition THIRTEENTH further states, "Consignor agrees to place in the Repository contemporaneously with the arrival of the horse on Keeneland sales grounds a disclosure statement, which shall be updated daily, signed by a duly licensed veterinarian which provides a listing of all medications, including dosage, administered to [the horse] within fourteen (14) days of sale." *Id.* "Purchaser shall have the same rights and duties regarding Rejection as provided in the Rejection section found in Condition Ninth[.]" *Id.* at 17.

---

[17] "Consignor shall have the sole responsibility concerning the accuracy of the disclosure/announcement of the condition of any horse as aforesaid and required above." DE #21-2, at 11. Additionally, Condition ELEVENTH—mentioned in the Complaint but no longer at issue per the briefing—states, "Consignor warrants that any . . . two-year-old entered in this sale shall not have been administered any exogenous or androgenous anabolic steroids ("AS") within 45 days of the date of sale." *Id.* at 13. However, "[i]n order for Purchaser to avail himself of this limited warranty he must check the appropriate box on the [PSA] at the time of sale." *Id.* Biszantz did not check the box. *Id.* at 2.

Critically, condition FIFTEENTH reminds the parties "that only the conditions set forth in these Conditions of Sale will allow Rejection and that Rejection hereunder **shall be Purchaser's sole and exclusive remedy.** In all other respects, the **AS IS** nature of this sale remains in full force and effect." *Id.* at 20 (emphases in original).

Condition TWENTY-FIRST again alerts the parties that "[p]urchasers are accepting any horse purchased with all defects except those conditions and defects specifically warranted by Keeneland's Conditions of Sale." *Id.* at 23. An inspection of the horse is an affirmative buyer duty and must include a review of *all Repository information* for the horse. *Id.* at 23-24. "Purchasers will be charged with knowledge of any defect that is or should be revealed by a reasonable inspection, including any defect that is or should be revealed by a review of the Repository information, [with limited exceptions not here implicated.]" *Id.* at 24.

The Consignor "**warrants the accuracy, validity and authenticity in all material respects of the Repository information placed by Consignor in the Repository.**" *Id.* at 24-25 (emphasis in original). The COS establishes a specific Rejection process if Consignor violates this provision. *Id.* However, this "limited right of Rejection . . . shall terminate . . . immediately upon the removal of the horse from Keeneland sales grounds[.]" *Id.* at 26.

> **b.  Although there are factual questions about contract compliance, the buyer undoubtedly did not pursue the exclusive COS remedies, and the Court enforces the COS remedial limitations and mechanics.**

There certainly would be factual questions over Stephens's compliance with the COS on several fronts. The Court perceives the claims contested as (a) prior invasive

joint surgery disclosure; (b) disclosure of a qualifying bone structure condition; and (c) disclosure of medications.

SALINA had a prior arthroscopic surgery on a different ankle, and there is evidence of record that would place that type of surgery within the disclosure ambit of Condition NINTH. DE #36-15 (Bramlage Depo.), at 7 (Depo. pp. 25-26). Mr. Stephens denies learning about the surgery from Dr. BonenClark, but the veterinarian certainly testified in a manner that would support a finding that Mr. Stephens learned of that surgery (though both may have thought it inconsequential) at the time of the 2012 purchase. DE #36-3 (BonenClark Depo.), at 4 (Depo. p. 16) ("I would have told him about it."). In any event, it is the Consignor's duty to make an accurate disclosure, DE #21-2, at 24-25, so the Court views Stephens as obligated to present a clear picture of qualifying surgical history. There was no disclosure in the 2013 sale Repository, a likely violation of the COS.

Similarly, factual questions attend the disclosure as to the suspensory branch. The duty hinges on diseased/injured bone structure and treats as compliant adequate disclosure of radiographs or a certificate. *Id.* at 15. Indeed, even to contest disclosure adequacy, a purchaser must present counter radiographic proof in a timely manner. *Id.* Here, the radiographs were in the Repository, and Dr. Chovanes unquestionably indicated sesamoiditis in his report.  This may have been enough, if indeed SALINA's condition triggered a disclosure duty, but that would likely be a fact question. Again, cutting in Stephens's favor is the language of the COS qualifier—the condition must be one sufficiently likely to impact the horse's racing or training. *Id.* ("Any [two-year-old in training] . . . which has an injury to or disease of the bone structure which, in the opinion

of a veterinarian, would more likely than not materially and adversely affect its suitability for training and racing . . . must be so disclosed by placing radiographs and/or a veterinary certificate in the Repository . . . reasonably disclosing that one or more of the conditions are applicable."). Here, Dr. BonenClark estimated 75% of horses would perform athletically despite the lesion diagnosis. DE #36-3 (BonenClark Depo.), at 7 (Depo. pp. 26-27). Even Dr. Bramlage (post the second injury) put the full recovery hopes at 50/50, DE #36-15 (Bramlage Depo.), at 4 (Depo. pp. 13-14), and SALINA did significantly improve during the August to November 2013 period. The point is this: If Dr. BonenClark held such a favorable prognosis, and if SALINA had continuously trained leading up to the sale, showing no problems, was the suspensory at a point that would trigger a disclosure duty? Was SALINA, in April 2013, under a bone structure condition that "would more likely than not materially and adversely affect [her] suitability for training and racing"? She evidently had trained continuously since at least the end of January, was apparently showing no outward signs of injury, and had radiographs that created only marginal concern among the veterinarians. [Further, the filly trained without any problems until Biszantz shipped her to New York in the summer of 2013.] It is far from clear that SALINA's suspensory branch was problematic in April of 2013. Still, the combination of Dr. BonenClark's January posture and the persistent sesamoiditis, along with the opinions of Drs. Bramlage, Spirito, and Hay, suggest a fact question over Condition THIRTEENTH and any disclosure duty as it relates to bone structure.

The medication disclosure issue also features competing evidence. The obligation begins at pre-sale arrival with a 14-day look back period. DE #21-2, at 16 ("Consignor

agrees to place in the Repository contemporaneously with the arrival of the horse on Keeneland sales grounds a disclosure statement, which shall be updated daily, signed by a duly licensed veterinarian which provides a listing of all medications, including dosage, administered to [the horse] within fourteen (14) days of sale."). The parties have not pointed to when SALINA arrived, but she breezed and Dr. Chovanes radiographed her on April 4. Thus, the duty applied for at least 14 days before April 4 (*i.e.*, March 21). The duty of daily currency then applies. If SALINA received an undisclosed Bute injection or Adequan or another medication during the 14 days pre-arrival and pre-sale—and there is evidence she did—then Stephens failed in this duty. *See, e.g.*, DE #36-7 (Ocala Equine Hospital records). There also is little question that the disclosures in the record are not compliant to the extent they do not reflect veterinary involvement or objectively meaningful dosages. *See* DE #21-7.

The Court, for all of these reasons, would not grant summary judgment on the existence of breach. That does not end the analysis, however. The contract could not be clearer on its rigid mechanics, time limits, and remedial limitations. These are enforceable and resolve any breach of contract claims. Whatever rights Biszantz had as to SALINA's condition at the time of sale lapsed by failure to abide by the COS as written.

The COS sensibly treats horseflesh as volatile and subject to sharp and sudden changes in condition. Thus, the COS puts a heavy inspection expectation on buyers, limits warranties to those set forth in the COS, and imposes a rigorous post-sale set of mechanics for warranty enforcement. Those mechanics look harsh, in a vacuum, but reflect the experience and market savvy of Keeneland as a keystone thoroughbred

marketplace, with the assent of participating horsemen. Biszantz and Stephens joined into the deal, via the Keeneland terms, knowingly, competently, and voluntarily.

Without question, Biszantz did not pursue any of the intra-COS remedies. He had 14 days to raise an issue over prior surgery disclosure. He had 24 hours (amid other conditions) to raise an issue over the qualifying bone-structure disclosure and/or medications. Again, the COS warranties are exclusive, yield rejection as the remedy, and treat rejection as the sole relief for a warranty breach. Failure to comply with the mechanics removes rejection as an option. *See* DE 21-2, at 20 (Rejection is "**Purchaser's sole and exclusive remedy.**" (emphasis in original)); *id.* at 15 (setting out notice requirements to elect rejection); *id.* at 25 (same).

This leaves Biszantz only with his effort to invalidate the COS terms, by arguing that the remedial limitations transgress the UCC. The Court rejects the arguments in this scenario. The Kentucky UCC governs application of remedial limitations and claims of unconscionability. First, "[r]emedies for breach of warranty can be limited in accordance with the provisions of this article on . . . contractual modification of remedy[.]" KRS 355.2-316(4). "[R]esort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." KRS 355.2-719(1)(b).

The COS represents an arms-length transaction between sophisticated horsemen; indeed, both appear as and likely are merchants under the UCC. *See* KRS 355.2-104(1) (defining merchant as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction[.]"). The COS expressly reflects that a horse's

condition can change immediately, even as soon as put under tack or moved from the sales grounds. Thus, the buyer knows he must rigorously inspect pre-sale and then must immediately post-sale confirm the horse's condition to invoke his bargained-for protections.

Regarding the surgery, Biszantz would have had 14 days to inquire about prior treatment (*e.g.*, through prior owners, veterinary records, and/or more intrusive inspection). He did not do this. On the medications and bone structure, the available time window is very small, but it is the limit the parties—both experienced and sophisticated horsemen—agreed to. Biszantz knew substantively about the disclosed medications given on site and knew there was no veterinarian signature. He, again, could have made a direct inquiry of Stephens, but the record reflects nothing of the sort. Further, there is no evidence indicating the medication history would have been material to the horse's condition at the time of sale.[18] On the matter of bone structure, Biszantz could have spent $195 and known more than Stephens could have disclosed—the suspensory status at the very time of sale.

Thus, there was no failure of remedial purpose. Biszantz entered a bargain painstakingly defined by the COS terms—indeed, terms to which he assented and by which agreed to be bound. Operation of the remedial limitations does not unfairly deny him the benefit of the bargain. Instead, it imposes the very bargain reached.

Unconscionability is an additional avenue by which the Court "may refuse to enforce the contract, . . . may enforce the remainder of the contract without the

---

[18] Biszantz also asserts that Stephens gave SALINA Clenbuterol on March 25, but does not cite to proof. DE #38, at 15. The training chart shows a general "Clen" notation for the month of March, *see* DE #36-19, at 20, which Dawson testified meant that SALINA was given liquid Clenbuterol without giving a more specific timeframe for or frequency of its administration, *see* DE #36-22, at 11 (Depo. pp. 42-44).

unconscionable clause, or . . . may so limit the application of any unconscionable clause as to avoid any unconscionable result." KRS 355.2-302. "An unconscionable contract is a contract which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Forsythe v. BancBoston Mortg. Corp.*, 135 F.3d 1069, 1074 (6th Cir. 1997) (internal quotation marks omitted). "The doctrine forbids only one-sided, oppressive, and unfairly surprising contracts, and not mere bad bargains." *Id.* (applying Kentucky law and noting the doctrine "is only used in rare instances"). Unconscionability is largely situational. *Id.* (noting the "fact-sensitive nature of unconscionability determinations"). For many of the same reasons as above, there is no unconscionability here.

In support of his argument, Biszantz cites a Fayette Circuit Court summary judgment order in *Solitary Oak Farm, Inc. v. Murphy*. *See* DE #36-21. There, the agent of the buyer (Pate) specifically inquired if the colt had undergone any surgeries, and the agent of the seller (Reece) affirmatively denied prior surgeries. However, in fact, the colt had undergone invasive joint surgery. Thus, the seller made an intentional, affirmative misrepresentation to the buyer, and it was difficult, if not impossible, for the Plaintiff to discover the defect within 14 days of the sale. "[B]ased on the facts o[f] the case," the Fayette Circuit Court declared this warranty period to be unconscionable "[g]iven the intentional misrepresentation[.]" *Id.* at 5. The court tied its decision to that case's specific facts, and the situation here differs in critical respects. Chiefly, in this case, the Court finds no intentional misrepresentation from Stephens to Biszantz similar to Reece affirmatively lying in response to Pate's specific, factual inquiry. Further, unlike in *Solitary Oak*, where an intentional misrepresentation caused the warranty's time

20

limitation to be inconsistent with the warranty's purpose, the Court has no such concern on these facts. *See Middletown Eng'g Co. v. Climate Conditioning Co., Inc.*, 810 S.W.2d 57, 59-60 (Ky. Ct. App. 1991) (enforcing a contract's exclusive remedy provision because it did not fail of its essential purpose).

Here, the COS's timing and/or remedy limitations did not fail of their essential purposes.[19] *See* KRS 355.2-719(2) (providing remedy if an exclusive or limited remedy fails of its essential purpose). "A limitation of remedy provision fails of its essential purpose when it deprives a party of the substantial value of its bargain. . . . As there are relatively few situations where a remedy can fail of its essential purpose, section 2-719(2) has been invoked most often in cases in which the exclusive remedy involves replacement or repair of defective parts, and the seller because of his negligence in repair or because the goods are beyond repair, is unable to put the goods in warranted condition." *U.S. Achievement Acad., LLC v. Pitney Bowes, Inc.*, 458 F. Supp. 2d 389, 404 (E.D. Ky. 2006) (internal quotation marks and citation omitted). As in *U.S. Achievement Academy*, Plaintiff did not take advantage of the offered warranties; he "should have invoked [his] sole remedy of [Rejection] within the [applicable] period." *Id.*; *see also Moore v. Mack Trucks, Inc.*, 40 S.W.3d 888, 892 (Ky. Ct. App. 2001); *Middletown*

---

[19] The COS is clear that its time requirements are essential to contract operation: "The physical condition of horses is subject to material change on a daily basis. **Time is of the essence. Failure to strictly comply with the notice requirements hereafter set out shall operate to disallow the protection of the applicable warranty in favor of Purchasers.**" DE #21-2, at 12 (emphasis in original). "The time requirements for Rejection . . . are: . . . (B) 14 days from the day of sale in the case of [applicable] surgeries[.]" *Id.* The condition then sets out a specific, sequential process for providing notice of Rejection. *Id.* (under **Notice Requirements for Rejection**). These time limitations are not arbitrarily imposed; rather, they are included in the COS for reasons central to horse sales: that a horse's material condition can change rapidly, that the provided dispute resolution protocol must occur promptly to evaluate an alleged condition while still on the sales grounds, to provide finality to the largely "as is" transaction, and to fairly evaluate parties' rights under the provided limited warranties.

*Eng'g*, 810 S.W.2d at 59 (rejecting the essential purpose argument when, "[i]f the seller were held responsible[,] . . . then this term of the contract between the parties would be rendered meaningless."). The COS, by its terms—bargained-for between two sophisticated, experienced parties—addresses and provides remedies for the problems Biszantz identifies; he simply failed to utilize them. *See Moore v. Landes*, No. 2005-CA-002237-MR, 2006 WL 2919064, at *6 (Ky. Ct. App. Oct. 13, 2006). An exacting contract, between equal parties on this subject matter, is not thereby unfair.

Counter to Biszantz's citation to one Circuit Court summary judgment order, this Court does enforce Keeneland's COS (including time limits and other remedial limitations). *See, e.g.*, *Keeneland Ass'n, Inc. v. Hollendorfer*, 986 F. Supp. 1070, 1073 (E.D. Ky. 1997); *Keeneland Ass'n, Inc. v. Eamer*, 830 F. Supp. 974, 985-87 (E.D. Ky. 1993). The horse-racing industry is doubtlessly vitally important in and to the Commonwealth. *See Mizan Arabians v. Pyramid Soc'y*, 821 F.2d 357, 360 (6th Cir. 1987). Enforcing the Keeneland COS's limitations is consistent with precedent, vital to the COS's operation, and strengthens future parties' reliance in contract enforceability; it does not, as Biszantz argues, make the COS "illusory." *See* DE #38, at 28.

Here, the prior surgery related to a different ankle, and no evidence shows the surgery (which Dr. Chovanes called "cosmetic", DE #36-9, at 15 (Depo. p. 57)) as material in any way to SALINA's fate. The medications also were substantially disclosed, and there is no evidence a more complete record would have been material. Regarding the bone structure, it is simply not unfair—and certainly not unconscionable—to hold an experienced party to its deal in this context, where (a) Stephens put the radiographs in the Repository along with an alerting report on sesamoiditis, and (b)

22

Biszantz had a veterinarian on site with equipment that could have scanned the filly and timely raised an immediate issue. Biszantz contracted into an environment requiring great vigilance. It is not unfair to hold him to this standard. *See Forsythe*, 135 F.3d at 1074 ("The terms of the release, though harshly applied . . ., were not unconscionable.") (noting Mrs. Forsythe was represented by counsel and negotiated the terms). There could be a scenario where intentional deception could lead to sparing a party from a remedial limit or requisite warranty enforcement steps, but this is not that case. The question is whether the parties' bargain was unconscionable at the time they entered it, per § 355.2-302, and there is simply no indication of that here.

In sum, although fact questions remain regarding COS compliance, Biszantz is not entitled to relief due to his similar failure to properly invoke his "sole and exclusive" remedy under the contract. *See* DE #21-2, at 20. Biszantz goes to great length to shift the blame onto Stephens, but as to the asserted breach of agreement claims, the record and testimony conclusively show that, viewed in the light most favorable to Biszantz—even if Stephens did breach each of the provisions—Biszantz fails to warrant relief.

2.    Creation of an Express Warranty

Because the agreement itself does not favor Biszantz's claims,[20] he next asserts that Stephens created, and then breached, an express warranty through Mr. Stephens's alleged pre-sale statement to Young that Mr. Stephens "liked [SALINA] a lot."[21] "[A]

---

[20] Likewise, the Complaint's allegation that Stephens created and breached a warranty by placing radiographs in the Repository that inaccurately reflected SALINA's condition at the time of sale—even if true—fails based on the text of the parties' agreement. DE #21-2, at 24-26 (If Repository information is inaccurate, Purchaser must elect Rejection within certain time restraints and following specific procedures.); *see also id.* at 20 (Under the COS, Rejection is Purchaser's sole and exclusive remedy.).

[21] Biszantz argues that the COS is not a complete integration of all terms of sale (and therefore, consideration of extrinsic statements is not barred). DE #38, at 29. Condition

positive affirmation of fact by a seller relating to the subject matter, may constitute an express warranty if it induced the sale and the buyer relies upon it." *King v. Ohio Valley Terminix Co.*, 214 S.W.2d 993, 996 (Ky. Ct. App. 1948); *see also* KRS 355.2-313(1)(a) ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty[.]"). Of course, the Kentucky UCC governs.

Biszantz cites to *Travis v. Wash. Horse Breeders Ass'n, Inc.*, 759 P.2d 418 (Wash. 1987) for his contention that Mr. Stephens's statement has factual meaning. DE #38, at 27. The advertisements in *Travis* described horses as "truly outstanding," and the agent described a horse as "a fine athlete" and "in very good condition." 759 P.2d at 419. Mr. Stephens's statement is qualitatively different. He expressed nothing objective or measurable; rather, he simply stated his own, subjective feeling about SALINA. Indeed, Young only understood the statement to mean that Mr. Stephens thought SALINA would "bring quite a bit of money." DE #36-13, at 3 (Depo. p. 11). The statement—averring nothing more than a personal view and representing to the recipient nothing more than a speculative possibility of future profit—is much more like "sales talk or expressions of opinion[,]" *see King*, 214 S.W.2d at 996, than a positive affirmation of fact. *See also*

---

TWENTY-THIRD contains a merger clause that permits the parties to "enter into an agreement which modifies the limited warranties as provided herein[.]" DE #21-2, at 29. As Biszantz argues, this provision, at least in some respects, permits side deals and additional terms. DE #38, at 29. (The Court doubts, however, that a unilateral statement can amount to the parties "enter[ing] into an agreement" to modify the terms of the COS.) Nevertheless, the condition also expressly provides that a party's "oral statements . . . concerning the physical condition or the racing abilities of the horse[] . . . do not constitute warranties, shall not be relied upon by the Purchasers and are not part of the contract for sale." DE #21-2, at 29. Again, even assuming Biszantz's argument is not barred by the twenty-third condition, he fails to establish a basis for relief as to creation and breach of a warranty through Mr. Stephens's statement.

*Middletown Eng'g*, 810 S.W.2d at 59; *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 562-63 (6th Cir. 2013).

The Court also notes that the record does not place the remark at a point in time, though the only reasonable inference is that it occurred pre-sale, since Young treated the remark as a prediction of what price SALINA would fetch at Keeneland. Thus, the statement obviously predated the formal contract. Plaintiff asks to stretch Kentucky law too far in this scenario. A value prediction of the type Mr. Stephens made would hardly, in this context, become part of the basis of the parties' bargain. Moreover, Mr. Stephens, by the statement, only subjectively commended the value of his own horse. Such talk is not warranty material in the Commonwealth. The Kentucky UCC could not be clearer: "[A]n affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." KRS 355.2-313(2). The COS bars Biszantz's side-warranty contention, DE #21-2, at 29, and regardless, even if it did not, Mr. Stephens's statement did not create a warranty.

B.     *Fraud*

Plaintiff next asserts fraud claims against Defendant, premised on essentially the same conduct as the breach of contract/warranty claims. DE #1-1, at 6-8. The general elements of fraud are as follows: "a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Serv. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). To prevail at any trial, Plaintiff must prove each element by clear and convincing evidence. *Id.* To survive the summary judgment stage, faced with a heightened proof requirement, Plaintiff must produce evidence that would support a rational trier's finding

25

under the clear and convincing proof standard. *Local Union 2-2000 United Steel v. Coca-Cola Refreshments USA, Inc.*, 547 F. App'x 707, 719 (6th Cir. 2013); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

      1.      The economic loss doctrine applies to bar the contractually based fraud claim.

Defendant first argues that the economic loss doctrine bars Plaintiff's fraud claims. DE #21-1, at 10. This rule "prevents the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 733 (Ky. 2011). The Kentucky Supreme Court applied the rule to negligence, strict liability, and negligent misrepresentation claims, but it refrained, on the facts before it, from applying the rule to an asserted fraud by omission claim. *Id.* at 733, 738, 746. Plaintiff argues against the doctrine's applicability on these facts. DE #38, at 30-33.

The "rule recognizes that economic losses, in essence, deprive the purchaser of the benefit of his bargain and that such losses are best addressed by the parties' contract and relevant provisions of Article 2 of the Uniform Commercial Code." *Giddings*, 348 S.W.3d at 738. "Three policies support applying the economic loss doctrine to commercial transactions: (1) it maintains the historical distinction between tort and contract law; (2) it protects parties' freedom to allocate economic risk by contract; and (3) it encourages the party best situated to assess the risk of economic loss, usually the purchaser, to assume, allocate, or insure against that risk." *Id.* at 739 (quoting *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).

As this District has forecasted, "The Kentucky Supreme Court may not have decided whether the economic loss doctrine applies to fraud claims, but it has indicated a preference for broader application of the doctrine." *Ashland Hosp. Corp. v. ProVation Med., Inc.*, No. 14-CV-44-DLB-EBA, 2014 WL 5486217, at *4 (E.D. Ky. Oct. 29, 2014). "A finding that fraud claims are exempt from the economic loss doctrine would not only represent a departure from the general trend of treating negligent misrepresentation and fraud claims similarly, it would create patently inconsistencies with the [Kentucky Supreme Court's] prior reasoning. Given the Kentucky Supreme Court's rather broad application of the economic loss doctrine, as well as the close relationship between fraud and negligent misrepresentation claims, this Court is now confident in predicting that the Kentucky Supreme Court would extend the economic loss rule to fraud claims." *Id.*; *see also Derby City Capital, LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 727-28 (W.D. Ky. 2013) (stating that because fraudulent inducement claim is inextricably intertwined with breach of contract claim, "it appears that the economic loss rule would preclude recovery" but ultimately not predicting or holding this because the fraud claim did not satisfy applicable pleading standards).

Here, Plaintiff's fraud claims are fundamentally interwoven with his breach of contract claims. All of Plaintiff's claims emanate from the same set of facts and are essentially restatements of each other, either as violations of the COS or under various theories of fraud. The Court agrees with *Ashland Hospital*'s prediction that the Kentucky Supreme Court would extend the economic loss rule to fraud claims, at least in these circumstances. *See Giddings*, 348 S.W.3d at 746 ("[N]egligent misrepresentation requires an affirmative false statement."); *cf. Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, No. 1:08-

CV-02755, 2010 WL 6765522, at *10 (N.D. Ohio Sept. 2, 2010) ("It would be inherently inconsistent to find that negligent misrepresentation claims survive the economic loss doctrine while fraud or fraud in the inducement claims do not.").

Looking to the recognized Kentucky rationales, first, the parties' interactions here are exclusively contractual; but for the negotiated sale of SALINA, the parties would have no relationship. Because Biszantz alleges, essentially, a defective good resulting only in loss of his bargain, the rule dictates that damages must be recovered, if at all, pursuant to the contract. Second, the COS is a classic example of sophisticated, experienced parties precisely allocating risk via mutual agreement; it contains exacting grievance and resolution procedures and a variety of protections, warranties, and disclaimers specific to the unique circumstances presented in a horse sale. Applying the economic loss rule protects the parties' granular agreement. Likewise, third, application of the rule encourages the purchaser to evaluate and take appropriate action regarding any risk. Thus, Biszantz entered a contract that accounted particularly for all of the risks of the deal. He now seeks to avoid that risk allocation, and thus preserve his side of the deal alone, by resorting to tort principles, an effort the economic loss doctrine prevents.

Seeking to avoid application of the rule, Plaintiff cites to *Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 981 (7th Cir. 2003) (holding that "Wisconsin would not apply the economic loss doctrine to bar" an action "for the rescission of a contract"). Here, Plaintiff's relevant "cause[] of action" is "[f]raud[.]" DE #1-1, at 6 (emphases removed). Biszantz seeks "to recover damages reflecting the difference in the fair market value of the filly . . . or to void the sale with a return . . . of all costs[.]" *Id.* at 7-8. He reiterates that he "demands damages[,]" as well as "an Order

that the sale be voided and restitution-based damages[.]" *Id.* at 9. The word rescission does not appear. *See Bryant v. Troutman*, 287 S.W.2d 918, 920 (Ky. 1956) ("[I]f the purchaser was induced to enter into the contract in reliance upon the false representations, he may maintain an action for re[s]cission, or he may accept the contract and sue for damages suffered on account of the fraud[.]"). Biszantz chose fraud and sued in tort. The complaint affirms that Biszantz seeks fraud-based money damages, including punitive damages, even if he also seeks "void[ing] the sale." *See Gargotto v. Sherman*, 180 S.W.2d 565, 566 (Ky. 1944) ("If a rescission is sought, it is incumbent upon [the buyer] . . . to plead a tender or a return of the property."). As the Seventh Circuit noted, "[i]n tort, the remedies are damages[.]" *Harley-Davidson*, 319 F.3d at 986. The scope of the rule also differs between Wisconsin and Kentucky; Wisconsin's economic loss rule is comparatively limited. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 852 (Wis. 1998) (applying economic loss doctrine to strict liability and negligence).[22]

---

[22] Indeed, the Wisconsin Supreme Court later adopted a "very narrow" "fraud in the inducement exception to the economic loss doctrine." *Digicorp, Inc. v. Ameritech Corp.*, 662 N.W.2d 652, 662-63 (Wis. 2003); *accord Kaloti Enters., Inc. v. Kellogg Sales Co.*, 699 N.W.2d 205, 219 (Wis. 2005). This exception, though, "does not apply when the fraud pertains to the character and quality of the goods that are the subject matter of the contract." *Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 989 (7th Cir. 2005); *see also Irwin Seating Co. v. Int'l Bus. Machs. Corp.*, 306 F. App'x 239, 243-44 (6th Cir. 2009) (recognizing same exception under Michigan law). This honors the rule's intent to bar the parties from using "tort principles to circumvent the terms of an agreement." *Cerabio*, 410 F.3d at 988. The exception "does not address the situation where the only misrepresentation by the dishonest party concerns the quality or character of the goods sold, as the other party is still free to negotiate warranty and other terms to account for possible defects in the goods." *Id.* at 989-90 (internal quotation marks, alterations, and citation omitted). Similarly, to invoke Wisconsin's exception, the fraud must be "extraneous to, rather than interwoven with, the contract." *Kaloti Enters.*, 699 N.W.2d at 219 (quoting *Digicorp*, 662 N.W.2d at 662). Plaintiff attempts a similar exception here, which the Court rejects. Biszantz hardly was tricked into entering a contract that addresses so comprehensively and encyclopedically the full course of conduct.

The Kentucky Supreme Court determined that, unlike in Wisconsin, the rule does apply to negligent misrepresentation claims. *Harley-Davidson*'s holding rested on premises fundamentally different from those the Court now faces. The Kentucky Supreme Court in *Giddings* outlined a broad vision of the rule. Federal district courts in both the Eastern and Western Districts of Kentucky have either held or strongly indicated that the logical underpinnings of the doctrine, as expressed by the Kentucky Supreme Court, would equally apply to allegations of fraud (at least those that are inextricably intertwined with breach of contract claims). This Court agrees. Plaintiff's fraud theory centers on performance of the duties and obligations enumerated in the lengthy COS. No duty independent of or not addressed by the COS exists, demonstrating the fraud claim's interdependence on the contract. The economic loss rule is an independent reason to deny Plaintiff's contractually derived fraud claims under Kentucky law.[23]

> 2.    Alternatively, because the record reveals no actionable duty or misrepresentation, Biszantz's fraud claims fail.

Under Kentucky law, to prevail on fraud by omission claims, Biszantz must prove that "(1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence." *Giddings*, 348 S.W.3d at 747; *see also Smith v. Gen. Motors Corp.*, 979 S.W.2d 127, 129 (Ky. Ct. App. 1998). "The existence of a duty to disclose is a matter of law for the court." *Giddings*, 348 S.W.3d at 747. "[M]ere silence is not fraudulent absent a duty to disclose."

---

[23] Paragraph 27 of the Complaint perhaps best shows this interconnectedness. In that paragraph, which is within the fraud count, Plaintiff directly relies on asserted fraudulent conduct as voiding the COS limitations. *See* DE #1-1, at 8. The problem is that the conduct characterized as fraudulent is simply Stephens's performance (or not) under the requirements of the COS, a matter of contract.

*Smith*, 979 S.W.2d at 129.[24] Kentucky recognizes a duty to disclose in four circumstances: "arising from a confidential or fiduciary relationship[,] . . . a duty provided by statute[,] . . . when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure[,] . . . or where one party to a contract has superior knowledge and is relied upon to disclose same[.]" *Giddings*, 348 S.W.3d at 747-48 (internal quotation marks and citations omitted).

"Fraud by omission is not the same, at law, as fraud by misrepresentation, and has substantially different elements." *Giddings*, 348 S.W.3d at 747 (internal quotation marks and citation omitted). A fraudulent misrepresentation claim requires proof, by clear and convincing evidence,[25] of the following elements: "(1) that the declarant made a material representation to the plaintiff, (2) that this representation was false, (3) that the declarant knew the representation was false or made it recklessly, (4) that the declarant induced the plaintiff to act upon the misrepresentation, (5) that the plaintiff relied upon the misrepresentation, and (6) that the misrepresentation caused injury to the plaintiff." *Flegles, Inc. v. TruServ Corp.*, 289 S.W.3d 544, 549 (Ky. 2009) (citing *Rickert*, 996 S.W.2d 464). Plaintiff's reliance must be reasonable or justifiable. *Id.* "The misrepresentation, moreover, must relate to a past or present material fact. A mere statement of opinion or prediction [of future performance] may not be the basis of an action." *Id.* (internal quotation marks and citation omitted); *see also id.* at 552. "[M]ere optimism, even excessive optimism, is not actionable." *Id.* at 550.

---

[24] *See also Hall v. Carter*, 324 S.W.2d 410, 412 (Ky. 1959) (Silence may be fraud "when the circumstances surrounding a transaction impose a duty or obligation upon one of the parties to disclose all the material facts known to him and not known to the other party.").

[25] Either variety of fraud invokes the clear and convincing proof standard. *See, e.g.*, *Arnsperger v. Becker*, No. 2012-CA-486-MR, 2015 WL 301262, at *3 (Ky. Ct. App. Jan. 23, 2015) (applying the clear and convincing proof standard to a fraud by omission claim).

The only affirmative representations are Mr. Stephens's alleged "like her a lot" remark and, perhaps, the Repository radiographs. The Court finds neither an actionable misrepresentation. There is no evidence that the radiographs were inaccurate or incomplete. They, paired with the Chovanes report, affirmatively disclosed the bone condition—sesamoiditis. The "like her a lot" remark is not a factual misrepresentation, especially given how Young treated the remark. Mr. Stephens's statement merely expressed his opinion on SALINA, and Young understood it to only reflect a prediction of sales potential. As in the warranty analysis, the representation must be one of fact, not opinion. *See McHargue v. Fayette Coal & Feed Co.*, 283 S.W.2d 170, 172 (Ky. 1955) ("Actionable misrepresentation must relate to a past or present material fact which is likely to affect the conduct of a reasonable man and be an inducement of the contract. A mere statement of opinion or prediction may not be the basis of an action.").

On fraud by omission, the first two duty circumstances (fiduciary relationship and statutory duty) obviously are inapplicable here. *See Giddings*, 348 S.W.3d at 747-48. The critical questions relate to circumstances three and four. Biszantz fails to establish, for summary judgment purposes, that Stephens partially disclosed material facts while creating the impression of full disclosure, and he fails to introduce sufficient evidence that Stephens had superior, but undisclosed, knowledge on which Biszantz reasonably relied.

As to failure to disclose (regarding the prior surgery, the suspensory branch, and the medications), the prior surgery and medications led to no harm as a matter of law. Biszantz does not here contend, with any competent evidence fitting the rigorous fraud

standard, that the prior surgery, on a different leg, or the medicine particulars had any impact on SALINA's value or performance.

Regarding the suspensory branch issue, the Court emphasizes several things:

First, Stephens disclosed accurately the radiographs and the sesamoiditis. Stephens placed current radiographs and a report describing the filly's observed condition in the Repository.[26] Second, Biszantz, by the COS terms, had an inarguable duty to make a full inspection of the horse. Third, Young saw the horse many times and had no impediment to full assessment. Fourth, SALINA had continuously trained since before the January 2013 ultrasound, without missing a day (per Stephens and the sole proof) and the radiographs showed a condition, per Dr. BonenClark, about which only 1 or 2 out of 5 veterinarians would be concerned in April 2013. The evidence shows that Mr. Stephens (and Dawson) knew the horse had an enlarged branch in September, handled the horse conservatively, knew the branch had improved by December, and knew the horse, though training, was stable as of late January. Sixty days of training later, SALINA was at Keeneland for all to see, and there is no evidence of physical limitation(s) at that time or treatment in the interim.

Fifth, no testimony suggests SALINA exhibited soreness or swelling at the time of the sale. Indeed, post-sale, she trained in Florida for several months without apparent incident or limitation. Dr. BonenClark happened to see her as he helped prepare horses for transport to New York. He testified that Biszantz's farm had reported no problems with the horse and reported her as performing well. This strongly supports the view that SALINA's condition in April 2013 was sound, or at least that Stephens had no current

---

[26] To the extent Biszantz alleges the radiographs failed to show avulsion fractures, pre-sale radiographs could not reflect post-sale injuries. *See* DE #36-15, at 11 (Depo. p. 41).

reason or duty to make a contrary report. *See also Chernick v. Fasig-Tipton Ky., Inc.*, 703 S.W.2d 885, 888-89 (Ky. Ct. App. 1986) (upholding damage award only when seller "deliberately and consciously suppressed" a mare's "profound defect" of which the seller was "aware many months before the sale, during the sale and following the sale"). Sixth, Biszantz dealt with Stephens knowing the COS defined the parties' duties and expectations. Thus, he could not rely reasonably on anything except the listed and well-cabined disclosure warranties, and the COS limitations should have reasonably tempered his reliance even on such warranties. Seventh, Biszantz, himself an experienced market participant, had a qualified veterinarian and expert agent on the scene. They both had full access to SALINA. Dr. Hay could (and a COS compliant buyer would) have learned of the sesamoiditis. He could have chosen to do an ultrasound for $195 that would have given a full and up-to-date view of the suspensory branch at the time of or just after the sale. Dr. Hay did not view the report, and Biszantz did not otherwise assay the issue.

Further, "mere silence does not constitute fraud by omission where it relates to facts open to common observation or discoverable by the exercise of ordinary diligence, or where means of information are as accessible to one party as to the other." *Giddings*, 348 S.W.3d at 749 (internal quotation marks, alterations, and citation omitted). Biszantz makes a specific argument that Stephens was required to disclose SALINA's particular training regimen and Dr. BonenClark's training recommendations. DE #38, at 37. Plaintiff cites no authority for this proposition, and the Court declines to create such an obligation. Instead, the COS states the information that must be included in the Repository, and training regimen information and recommendations are not included. Stephens thought SALINA was a "very sound, athletic, really very nice filly." DE #36-5,

at 12 (Depo. p. 48). Stephens sensed no reason to be alarmed at SALINA's training progress—indeed, Dr. BonenClark told Stephens that the sesamoiditis **improved** in the second ultrasound and that there was **no change** in the third, *see* DE ##36-3, at 8-9 (Depo. pp. 31-35); 36-8, at 11 (Depo. p. 43); 21-10, at 2—and the mere fact that she underwent a tailored exercise program (as all horses do) does not ripen an additional disclosure duty.[27] By all appearances and proof, the horse was, in early 2013, fulfilling the optimistic projections Dr. BonenClark gave in terms of recovering from the lesion.

Although the Court applies the economic loss doctrine, the fraud claims would not survive summary judgment even without that decision.[28] Not all of the cited factors are necessarily dispositive, but the Court finds no tort-based disclosure duty or actionable misrepresentation in this context. The combination of contract-based requirements, SALINA's particular history, the radiographs and sesamoiditis disclosure, and Biszantz's inspection right coalesces to convince the Court that there is no triable fraud issue.

---

[27] Additionally, Plaintiff asserts Stephens fraudulently failed to reveal all administered medications, but Biszantz makes no showing that this omission induced him to act. Biszantz certainly knew of the April 2 Bute administration, DE #21-7, at 1, and it did not change his purchase decision.

[28] Biszantz's final arguments—concerning Restatement (Second) of Torts §§ 529 and 550—similarly cannot survive review. First, "Kentucky has not adopted [§ 550], and there is no indication that Kentucky courts would do so." *Hall v. MLS Nat'l Med. Evaluations, Inc.*, No. 05-185-JBC, 2006 WL 2367139, at *4 (E.D. Ky. Aug. 15, 2006). Biszantz makes the additional argument that "the rules create the impression that no defects exist as to certain matters (or else they would be disclosed). As such, there is no need to inspect further as to those issues." DE #38, at 42. This argument ignores the plain text of the agreement, which reminds buyers that they "will be charged with knowledge of any defect that is or should be revealed by a reasonable inspection, including any defect that is or should be revealed by a review of the Repository information[.]" DE #21-2, at 24.

On § 529, the Court reiterates that the record indicates no instance of Stephens making a representation that it knew or believed to be materially misleading. The radiographs were accurate, and Mr. Stephens's subjective statement was not "a representation stating the truth," but rather expressed his subjective opinion about the filly.

Stephens did not make an incomplete or misleading disclosure, and his buyer could not reasonably have relied on a disclosure any broader or of more substance than what the detailed COS dictated. There is no sufficient basis to support a non-contractual duty. Biszantz knew or plainly should have known the strict limitations and boundaries of Stephens's disclosure, and the COS unequivocally barred Biszantz from relying on anything outside of those boundaries. Thus, Stephens owed only the disclosure the COS required, and Biszantz knew otherwise to rely only on himself.

There also is insufficient evidence to support that Stephens intentionally and materially misled Young, by omission or representation, as to the suspensory branch condition in April 2013. The scenario, imbued with contract, is exactly why the economic loss doctrine exists. Biszantz dislikes operation of the contract he entered and now seeks to exceed the realm of contract and improve his lot via tort. His economic losses, if any, result from the bargain, and the negotiated parameters of that contract must and should array the parties' rights.

## IV.    CONCLUSION

For the reasons stated, the Court **GRANTS** Defendant's motion for summary judgment (DE #21). The Court will enter a separate Judgment.

This the 11th day of February, 2015.

Signed By:

Robert E. Wier

United States Magistrate Judge